DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

JEFFREY A. BACKHUS (CABN 200177)
Assistant United States Attorney

    150 Almaden Boulevard, Suite 900
    San Jose, California 95113
    Telephone: (408) 535-5066
    FAX: (408) 535-5080
    jeffrey.backhus@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR 14-00028 EJD |
| Plaintiff, | GOVERNMENT'S SENTENCING MEMORANDUM |
| v. | |
| ROSALIO ORTIZ, | Date: September 23, 2019<br>Time: 1:30 p.m. |
| Defendant. | |

## I. INTRODUCTION

Rosalio ORTIZ ("ORTIZ") admitted to participating in a conspiracy to distribute 500 grams or more of a mixture or substance containing methamphetamine and pled guilty to a violation of 21 U.S.C. § 841(a)(1), and (b)(1)(A)(viii). ORTIZ has zero criminal history points, which results in a Criminal History Category of I. Moreover, although it took two separate safety-valve proffers to do it, ORTIZ has fulfilled all of the requirements of U.S.S.G. § 5C1.2 (a)(1)-(5), now that he has truthfully debriefed with the government within the meaning of § 5C1.2 (a)(1)(5). Accordingly, ORTIZ's base offense level is 38, minus two for safety valve, and minus another three for acceptance of responsibility, making his total offense level 33. With a Criminal History Category of I, ORTIZ's Guidelines range is now 135-168 months. However, for the reasons discussed below, the government agrees with Probation and

recommends a sentence of 108 months imprisonment, which is a 27-month variance from the low-end of the Guidelines.

## II. FACTS

Beginning in 2006, DEA Dallas began to investigate and target members of the Michoacán, Mexico region based La Familia and Los Caballeros Templarios, a/k/a "Knights Templar Cartel," operating in/around Dallas, Texas and throughout the United States. Through the DEA Dallas investigation, which included Court authorized Federal wiretaps, credible and reliable confidential source (CS) debriefings, and coordination with DEA agents located in Mexico City, DEA investigators have identified many high ranking members of the Knights Templar Cartel.

In 2013, DEA San Jose began investigation the drug trafficking activities of Marco Antonio OCHOA-Valladares ("OCHOA"), who had been in contact with one of the high-ranking Knights Templar Cartel members. DEA agents received authorization to intercept OCHOA's telephone conversations and learned, among other things, that OCHOA was supplying methamphetamine to another individual named Jose Abraham IBARRA-Martinez ("IBARRA"). IBARRA, in turn, would distribute methamphetamine to other customers, including ORTIZ.

Of particular relevance to this case, the investigation revealed that from approximately August and October 2013, IBARRA delivered methamphetamine to ORTIZ on at least three occasions. During each of the deliveries, IBARRA and ORTIZ spoke in Spanish and referred to each other as "primo." ORTIZ later admitted that he would then transport the methamphetamine from the Los Angeles area to Washington. ORTIZ also later admitted that he received $1,000 per package to deliver the methamphetamine to Washington.

The first delivery of methamphetamine occurred in the parking lot of a Lowe's Home Improvement Store located near the intersection of Interstate Highway 5 and Carmenita Avenue in Los Angeles, California. *During this transaction, ORTIZ had his son with him, who appeared to be roughly seven years old* (emphasis added). IBARRA provided ORTIZ with a plastic grocery bag containing approximately five pounds of methamphetamine. IBARRA had previously inspected the contents of the bag and noted that the methamphetamine was in a crystal state. Upon receiving the bag, ORTIZ inspected its contents and then proceeded to extract drug proceeds that ORTIZ had concealed in the air

filter of his (ORTIZ's) pickup truck.  ORTIZ then handed the drug proceeds to IBARRA.

The second delivery of methamphetamine took place in the parking lot of a grocery store located off Whittier Blvd in Whittier, California.  During this transaction, IBARRA provided ORTIZ with approximately ten packages of methamphetamine weighing approximately ten pounds total.  ORTIZ then placed the methamphetamine in a piece of luggage that was in the back of the SUV that ORTIZ was driving.  ORTIZ did not give IBARRA any money during this transaction.

The third delivery of methamphetamine took place on October 18, 2013, in Pico Rivera, California.  During this transaction, IBARRA provided ORTIZ with approximately eight pounds of methamphetamine.  The methamphetamine was in eight one-gallon freezer style bags that were inside a Home Depot heavy-duty box.  ORTIZ extracted approximately $4,000 from the air filter of the Ford SUV he was driving and provided it to IBARRA in exchange for the methamphetamine.  After ORTIZ left the scene of the transaction, he was stopped by law enforcement and the methamphetamine was seized.  ORTIZ was placed under arrested and agreed to answer questions.  Ortiz subsequently stated that the drugs did not belong to him, but he was transporting the methamphetamine to Washington State and was being paid $1,000 per bag of methamphetamine.  Ortiz stated he would be paid $8,000 for the transportation of the methamphetamine.  Subsequent laboratory tests showed that the seized methamphetamine consisted of 7,560 grams of actual methamphetamine.

## III. DISCUSSION

### A. Guidelines Calculations.

The government calculates ORTIZ's' Guidelines range as follows:

a. Base Offense Level, U.S.S.G. § 2D1.1(a)(5), (c)(1):　　38
(90,000 KG or more Converted Drug Weight)

b. Amount of Drugs:

　　Methamphetamine (Actual)　　7,560 grams
　　(13,608 KG Marijuana)

　　Methamphetamine (Mixture and Substance)　　15 pounds
　　(151,200 KG Marijuana)

c. Safety valve:
(Meets the requirements of U.S.S.G. § 5C1.2(a)(1)-(4) and
the Government finds Defendant has truthfully debriefed
within the meaning of § 5C1.2(a)(1)(5).)　　-2

|   |   |   |
|---|---|---|
| d. | Acceptance of Responsibility: | -3 |

If I meet the requirements of U.S.S.G. § 3E1.1, I may be entitled to a three-level reduction for acceptance of responsibility, provided that I forthrightly admit my guilt, cooperate with the Court and the Probation Office in any presentence investigation ordered by the Court, and continue to manifest an acceptance of responsibility through and including the time of sentencing.

|   |   |   |
|---|---|---|
| e. | Adjusted Offense Level: | 33 |

The above Guideline offense level calculation is correct and consistent with the facts and the law. ORTIZ's offense results in a base offense level of 33. See U.S.S.G. § 2D1.1(a)(5), (c)(1). In addition, the defendant accepted responsibility and timely notified the government of his intention to plead guilty, and the government now moves for the full 3-level reduction in the defendant's offense level. See U.S.S.G. § 3E1.1(a), (b). The government also agrees that ORTIZ meets the requirements for safety valve eligibility. Accordingly, he is entitled to a two-level reduction in his offense level, id. § 2D1.1(b)(17), and the Court may sentence him without regard to the statutory minimum. 18 U.S.C. § 3553(f).

Although the government does agree that ORTIZ has now satisfied the safety-valve requirements, the government was forced to conduct two safety-valve debriefings with ORTIZ because he lied during the first one. In particular, during the initial safety-valve debrief, ORTIZ only admitted to conducting the October 18, 2013 transaction with IBARRA, and adamantly denied that the first two transaction occurred. Although the government was not obligated to conduct another safety-valve debriefing, the government agreed to do so. Only during this second debriefing did ORTIZ fully accept responsibility.

**B.    The Court Should Reject Defendant's Bid for a Minor Role Reduction.**

Section 3B1.2(b) provides for a two-level decrease in a defendant's offense level if he "was a minor participant in any criminal activity." The defendant bears the burden of showing he is entitled to this adjustment and must prove by a preponderance of the evidence that he was "substantially less culpable than the average participant" in his offense. *United States v. Rodriguez-Castro*, 641 F.3d 1189, 1193 (9th Cir. 2011) (quoting USSG § 3B1.2, cmt. n.3(A)); *United States v. Diaz*, 884 F.3d 911, 916 (9th Cir. 2018) (nothing has "alter[ed] [the] defendant's burden to show that the nature of his participation rendered him substantially less culpable than other participants").

The relevant pool for comparison is "all actors who participated" in the "specific criminal scheme" if the court finds "sufficient evidence of their existence and participation." *United States v. Rojas-Millan*, 234 F.3d 464, 473-74 & n.5 (9th Cir. 2000). The comparison must be made to "the conduct of co-participants in the case at hand," not a "hypothetical average participant." *United States v. Cantrell*, 433 F.3d 1269, 1283 (9th Cir. 2006) (quotation omitted).; *see also United States v. Johnson*, 297 F.3d 845, 874 (9th Cir. 2002) ("Clarifying this rule, we have held that a defendant's culpability is to be measured against his co-participants, not a hypothetical average participant."); *United States v. Rosas*, 615 F.3d 1058, 1068 (9th Cir. 2010) ("Every drug trafficking defendant could point to an unknown network preceding them in the drug trade. Such an argument will normally be ineffective when considering whether the defendant is entitled to a mitigating role reduction.").

As the Sentencing Commission has explained, focusing on the case at hand accords with the Guidelines' directive that a role determination "is heavily dependent upon the facts of the particular case." USSG App. C. Amend. 794 at 117 (Nov. 1, 2015). For that reason, the job title that a defendant affixes to his criminal duties has only limited relevance. In the drug-trafficking context, it is well-settled that the "fact that a defendant acted as a drug courier does not mean his role was minimal or minor." *United States v. Davis*, 36 F.3d 1424, 1436 (9th Cir. 1994) (citations omitted). Instead, sentencing courts must continue to consider the "totality of circumstances." USSG § 3B1.2, comment. (n.3)(C).

Certain circumstances weigh against granting a minor role adjustment for defendants convicted of drug transportation offenses. For example, (1) the presence of "a substantial amount of drugs," *United States v. Rodriguez-Castro*, 641 F.3d 1189, 1193 (9th Cir. 2011); (2) "preparing for the offense," *id*.; (3) the defendant's status as driver and sole occupant of a drug-laden vehicle, *United States v. Hursh*, 217 F.3d 761, 770 (9th Cir. 2000); (4) the defendant's expectation of receiving a fee to smuggle the drugs, *Davis*, 36 F.3d at 1437; and (5) the defendant's prior drug-trafficking activity, each signals a heightened role. *See United States v. Murillo*, 255 F.3d 1169, 1179 (9th Cir. 2001), o*verruled on other grounds by Muehler v. Mena*, 544 U.S. 93, 101 (2005). While none of these factors standing alone is dispositive in the role analysis, each weighs against the adjustment because they suggest a heightened level of trust, involvement, and responsibility that runs counter to the idea the defendant was just "a minor player." *See Rodriguez-Castro*, 641 F.3d at 1193.

The commentary to the guideline lists five factors to aid the court in its analysis of a defendant's relative culpability. These factors are:

(i) the degree to which the defendant understood the scope and structure of the criminal activity;

(ii) the degree to which the defendant participated in planning or organizing the criminal activity;

(iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;

(iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts; [and]

(v) the degree to which the defendant stood to benefit from the criminal activity.

USSG § 3B1.2, comment. (n.3)(C). This list is "non-exhaustive." *Id*. While a sentencing court "must consider" those five factors, it may apply the reduction "even if some of the factors weigh against doing so," refuse to apply the reduction "even if some of the factors weigh in favor" of doing so, and "consider other reasons for granting or denying a minor role reduction." *United States v. Quintero-Leyva*, 823 F.3d 519, 523 (9th Cir. 2016).

Here, ORTIZ committed an aggravating offence involving a considerable amount of methamphetamine. *Rodriguez-Castro*, 641 F.3d at 1193 (substantial amount of drugs militates against role adjustment). In addition, ORTIZ had to prepare substantially to commit this offense. He had to make all of the arrangements to drive from Washington to Southern California to obtain the drugs, obtained money to pay for the drugs and, on two occasions, hid the money inside the engine compartment of the vehicle he was driving. In addition, ORTIZ was not a one-time narcotics smuggler, he has admitted to three separate transactions. ORTIZ was also paid $1,000 per package to transport the methamphetamine. If he made approximately $5,000 for the first transaction, $10,000 for the second, and $8,000 for the third, that is a total of $23,000, which is a substantial amount of money. ORTIZ also exercised decision-making authority when he brought his son with him during the first transaction, which the government finds extremely troubling. These facts do not favor a minor role finding.

The Court should also compare ORTIZ's role to that of the known and likely participants in his offense and should conclude that ORTIZ has not established he was substantially less culpable than the

average participant in his offense. Certainly, OCHOA and IBARRA, who has not been sentenced yet, are more culpable than ORTIZ. However, OCHOA and IBARRA, are not "average" participants, but above-average organizers.

Anthonio RUEDA-AYALA was the other narcotics transporter charged in this case. RUEDA-AYALA was held responsible for a single narcotics transaction. In particular, RUEDA-AYALA was arrested on August 6, 2013, near Chowchilla, California, and found to be in possession of thirteen one-gallon sized zip-lock bags containing methamphetamine, secreted in a hidden compartment in his vehicle. The thirteen one-gallon sized zip-lock bags contained 6,334 net grams of actual methamphetamine.

In contrast to RUEDA-AYALA, ORTIZ participated in three transactions rather than one. In addition, ORTIZ is responsible for considerably more methamphetamine than RUEDA-AYALA. If anything, ORTIZ is substantially more culpable than RUYEDA-AYALA.

The Court should also look to the five factors identified in the commentary to the guidelines. *Diaz*, 884 F.3d at 916 ("[T]he district court was not obligated to tick off the factors on the record to show that it considered them[.]"). The Court should consider the "degree to which the defendant understood the scope and structure of the criminal activity," USSG § 3B1.2 cmt. n.3(C)(i). The government acknowledges that ORTIZ could not know everything about this organization, but did quite a bit: ORTIZ knew he was working for a drug organization that smuggled drugs using automobiles. ORTIZ knew that because he had done it two times before he was arrested. ORTIZ knew the person who brought him into the organization to transport methamphetamine. ORTIZ knew where to go to deliver the methamphetamine and knew that he would be paid $1,000 per package to deliver it.

ORTIZ had to plan and organize before he took each trip. USSG § 3B1.2 cmt. n.3(C)(ii). As stated above, ORTIZ had to make all of the arrangements to drive from Washington to Southern California to obtain the drugs, obtain money to pay for the drugs and, on two occasions, hid the money inside the engine compartment of the vehicle he was driving. More significantly, ORTIZ chose to bring his 7-year old son with him during one of the transactions. That tended to show he had some decision-making authority, since his child was in the car with him with a significant amount of methamphetamine. ORTIZ had many alternatives to driving with his son in a drug-laden car. Instead,

GOV'T SENTENCING MEMO.  7
CR 14-00028 EJD

he elected to bring him.

The nature and extent of ORTIZ's participation was far reaching. USSG § 3B1.2 cmt. n.3(c)(iv). ORTIZ has admitted to transporting methamphetamine multiple times and was arrested during the third transaction. This does not favor a minor role finding. ORTIZ is responsible for an extremely large amount of methamphetamine and stood to profit greatly from his activity. USSG § 3B1.2 comment. (n.3)(c)(v). Even if he received less than the $23,000 mentioned above, it was certainly not an insubstantial amount.

Given the specific facts of ORTIZ's offense, the Court should find that ORTIZ failed to prove that he was substantially less culpable than the average participant in his offense. Accordingly, the Court should deny ORTIZ's request for minor role.

### C. The Court Should Not Grant ORTIZ's Request for a Variance Based on His Status as a Deportable Alien.

ORTIZ argues that he is entitled to a downward variance because his status as an alien which makes him ineligible for certain prison programs that are available to citizen inmates, such as half-way house prior to release. However, Ortiz's ineligibility for timely halfway house release does not justify a reduced sentence. While an alien might be eligible for a downward departure, the bar for such a departure is set very high. *See United States v. Charry Cubillos*, 91 F.3d 1342, 1344 (9th Cir.1996). Among other things, the defendant must show the difference in severity is "substantial" and the Court must be persuaded that the greater severity is undeserved. 91 F.3d at 1344 (citation omitted). The circumstances justifying such a departure are "quite rare." *Id*. The blanket allegations of general unfairness he makes now are clearly insufficient to meet such a burden. Moreover, ineligibility for certain prison programs due to one's status as a deportable alien is generally insufficient to justify such a downward departure. *See, e.g.,United States v. Alcaza*, No. 06–CR–00095–LHK, 2014 WL 2938514, *5 (N.D.Cal. June 26, 2014); *United States v. Esparza–Cruz*, No. 08–CR–3513, 2011 WL 2682701, at *3 (S.D.Cal. July 11, 2011); *United States v. Martinez*, No. 06–CR–2119, 2009 WL 4042868, at *2 (E.D.Wash. Nov. 18, 2009). Accordingly, the Court should deny any variance on this basis.

### D. The Court Sentence ORTIZ to 108 Months of Imprisonment to Avoid Unwarranted Sentencing Disparities.

As stated above, OCHOA and IBARRA, who has not been sentenced yet, are more culpable than ORTIZ. Because he is more culpable, OCHOA received a sentence of 132 months of imprisonment. However, any argument that ORTIZ is less culpable than RUEDA-AYALA has no basis in fact. ORTIZ participated in three transactions whereas ORTIZ was only held responsible for one. In addition, ORTIZ is responsible for considerably more methamphetamine than RUEDA-AYALA.

Admittedly, RUEDA-AYALA's criminal history category was III, but he had no felony convictions. Because of his criminal history category, RUEDA-AYALA received a sentence of 120 months of imprisonment.

Here, despite the fact that ORTIZ is substantially more culpable than RUYEDA-AYALA, defendant is arguing for a sentence of no jail time, home confinement and 500 hours of community service. Such a sentence is grossly insufficient and would be the definition of sentencing disparity. In his sentencing memo, ORTIZ lists several cases to justify the unprecedented sentence that he is asking for. The government could list numerous cases where defendants were less culpable than ORTIZ, but received even higher than the 108 month sentence recommended by Probation and the Government. However, the government does not believe comparing cases in such a manner is productive or relevant. Each defendant comes before this court with different circumstances, different histories and different characteristics. Each defendant should be considered individually. Given ORTIZ's conduct in this case and his individual circumstances, a sentence of 108 months of imprisonment is appropriate.

### E. Departures Based on Family Circumstances, History and Characteristics, and Employment.

The government acknowledges ORTIZ's traumatic childhood and the tremendous personal challenges that ORTIZ and his family currently face. In addition, ORTIZ has no previous criminal history, and has the support of his family and the others that wrote letters on his behalf. Based on these factors, the government agrees with probation that a 27-month variance is appropriate, despite the fact that he is more culpable than RUYEDA-AYALA.

Moreover, while ORTIZ's family circumstances are challenging, the government would be

remiss that ORTIZ was involved in the distribution of large quantities of methamphetamine, which can have a devastating impact on families within his own community. "The consequences of methamphetamine abuse are terrible for the individual – psychologically, medically, and socially." Nat'l Inst. on Drug Abuse, "Methamphetamine Abuse and Addiction," Nat'l Inst. of Heath Pub. 13-4210 (rev. Sept. 2013) at 1.[1] Methamphetamine can cause memory loss, aggression, psychotic behavior, cardiovascular damage, malnutrition and severe dental problems from the dry mouth and bruxism that commonly accompany its use. Id. "Beyond its devastating effects on individual health, methamphetamine abuse threatens whole communities, causing new waves of crime, unemployment, child neglect or abuse and other social ills," including increased transmission of infectious diseases, such as hepatitis and HIV/AIDS. Id. The enormous costs of methamphetamine use – estimated at $23.4 billion nationally in 2005 – are apparent every day in every Superior Court in this Country. Though drug dealing often is viewed as a victimless crime – or at least one where the victims' injuries are self-inflicted[2] – it is a crime with enormous human costs. Through his actions, ORTIZ has contributed to that human cost in his own way.

Lastly, based on ORTIZ's sentencing brief and the accompanying letters, it appears that ORTIZ now realizes that he put his family in tremendous jeopardy by transporting methamphetamine. What makes it even more troubling is that, as defense counsel has pointed out, ORTIZ has a long history of employment. By all accounts, the defendant had the knowledge and employability to hold several good paying jobs, but instead put his family in jeopardy by choosing to engage in the distribution of drugs.

**F.     A 108 Month Term of Imprisonment is Appropriate in this Case.**

The government respectfully requests that the Court impose a below-Guidelines sentence of 108 months of imprisonment. This sentence is supported by the § 3553(a) factors; in particular, the history and characteristics of the defendant, promoting respect for the law, the seriousness of the offense, deterring future criminal conduct, and protecting the public.

---

[1] This report is available at https://www.drugabuse.gov/publications/research-reports/methamphetamine/letter-director, and the tabs associated with it (last visited Jan. 6, 2017).
[2] Though it is difficult to understand how someone would choose the miserable and uncertain life of a drug addict. The hardship itself, and the difficulties people face in ending their addictions, indicate that it is not a choice made free of compulsion.

GOV'T SENTENCING MEMO.            10
CR 14-00028 EJD

1   "The overarching statutory charge for a district court is to impose a sentence sufficient, but not greater than necessary" to achieve the goals of section 3553(a). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (internal quotations omitted). Because national consistency is an important goal of sentencing, "the Guidelines should be the starting point and the initial benchmark" at sentencing. *Gall v. United States*, 552 U.S. 38, 49 (2007). However, the Guidelines are only one consideration, and district courts then must evaluate the factors set forth in Section 3553(a) to determine whether they support the Guidelines calculation and sentence recommended by each party. *Id*. at 49-50; *see also United States v. Booker*, 543 U.S. 220 (2005).

Here, there is no doubt that 108 months is a substantial amount of imprisonment. However, the sentence is high because of the significant aggravating factors in this case. As stated above, ORTIZ is responsible for transporting an extremely large amount of methamphetamine from California to Washington, and did so on three separate occasions. More significantly, ORTIZ chose to bring his son with him during one of the trips. ORTIZ had to make all of the arrangements to drive from Washington to Southern California to obtain the drugs, obtain money to pay for the drugs and, on two occasions, hid the money inside the engine compartment of the vehicle he was driving. Finally, ORTIZ brought pounds of methamphetamine into his own Washington community, which could have a devastating effect of families living there.

With respect to the defendant's history and characteristics: The government acknowledges the personal challenges that ORTIZ is facing and also recognizes that ORTIZ has led a crime-free live until his involvement in this case. However, based on his conduct in this case and the need to avoid unwarranted sentencing disparities, the government recommends a sentence of 108 monts of imprisonment, followed by a five year term of supervised release, on the terms recommended by Probation.

DATED: September 17, 2019           Respectfully submitted,

DAVID L. ANDERSON
United States Attorney

/s/
JEFFREY A. BACKHUS
Assistant United States Attorney